**McDONNELL–PERKINS BUILDERS, INCORPORATED, Appellant,**

v.

**Johnnie E. CRANFORD et ux., Appellees.**

No. 16032.

Court of Civil Appeals of Texas.

Fort Worth.

Oct. 16, 1959.

Rehearing Denied Nov. 13, 1959.

McDonald, Sanders, Nichols, Wynn & Ginsburg and Atwood McDonald, Fort Worth, for appellant.

Morgan & Shropshire and David B. Owen, Fort Worth, for appellees.

MASSEY, Chief Justice.

In the early spring of 1957, Johnnie E. Cranford and his wife closed a transaction whereby they purchased, and McDonnell-Perkins Builders, Incorporated, delivered to them, a certain lot with improvements thereon which they made their home. On or about May 25, 1957, a flood occurred as the result of which a nearby waterway rose and inundated the property. Damage occurred to the property as the result thereof, with which we are not concerned. The Cranfords brought suit against the Corporation on the grounds of actionable fraud based upon allegation that they were induced to purchase by a false representation that the property was not in a flood area. Trial was to a jury. Upon answers returned to special issues submitted, judgment was rendered against the defendant Corporation.

Reversed and remanded.

■ Appellant McDonnell-Perkins Builders, Incorporated, raises the contention that the judgment entered below was utterly void in that the trial court had lost the jurisdictional power to enter a judgment. The verdict of the jury was received and filed on March 27, 1958. Judgment was not rendered until October 29, 1958. The judgment was not rendered during the term of court next succeeding that during which the verdict was received and filed, but during the one next succeeding such term. It is appellant's contention that though the trial court had jurisdiction to enter a judgment in this case during the term next succeeding that of the trial, it lost its power to enter any judgment after its expiration.

We are of the opinion that we should ignore the fact that the judgment was not entered on the verdict until the second succeeding term after it was received and filed. We are of the opinion that the error involved, if any, was not such as prevented the appellant from making a proper presentation of the case to the appellate courts. Texas Rules of Civil Procedure, rule 434. Under the holding of the Supreme Court in Williams v. Wyrick, 1952, 151 Tex. 40, 245 S.W.2d 961, on the entry of a nunc pro tunc after time had expired for the entry of a regular judgment, Chief Justice Hickman pointed out that the judgment was for recovery by plaintiff of and from the defendant for an amount in damages less than the amount in damages found by the verdict of the jury, and such fact was treated as inconsequential and of no moment in the affirmance of the judgment for lesser damages the trial court had entered in favor of the plaintiff on the undoubted premise that the evidence adduced supported damages only to the extent of the judgment figure.

Judge Hickman so treated the damages amount despite the peculiar result discussed as having been reached in the case of Waggoner v. Davis, Tex.Civ.App., Beaumont 1924, 261 S.W. 482, which held that the verdict of the jury would be res judicata on the issues of fact found and for that reason affirmed a trial court judgment and held at the same time that the trial court had no authority to render the judgment.

As will be presently observed, we are of the opinion that the facts found by the jury, if raised by the evidence, demonstrate appellees' right to judgment, and hence would be res judicata of the issues determined by the jury (except for the proper

amount to be awarded as damages). If it could be said that the judgment entered was void, the rather ridiculous situation would obtain whereby all appellees would need to do would be to file suit on the same cause of action, plead the verdict as res judicata of all issues in the case, and demand that the trial court render the exact judgment which is before us.

In the Williams v. Wyrick case the judgment in question had been rendered and entered nunc pro tunc, while here it was rendered and entered as of the date of its execution. In both instances, however, the circumstances were such that rendition as well as entry of the judgment was a ministerial act not involving the exercise of judicial discretion. We therefore observe no distinction to be made in the law applicable to the question and no difference in the result proper to be reached. In Couch v. City of Richardson, Tex.Civ.App., Dallas 1958, 313 S.W.2d 949, writ refused, n. r. e., the court relied upon the decision and language of Williams v. Wyrick in affirming a judgment. A somewhat similar question was involved in that not only was the plaintiff denied relief prayed for, but the defendant was granted affirmative relief against the plaintiff under a cross-action. Though more than one term of court intervened between the date of the verdict and date of the judgment, the judgment was entered in regular form and not "nunc pro tunc". In Turner v. Texas Sportservice, Tex.Civ. App., San Antonio 1958, 312 S.W.2d 388, writ refused, n. r. e., a judgment non obstante veredicto was entered in the second term of court succeeding the term during which the jury's verdict was returned. The form of this non obstante judgment was regular and not "nunc pro tunc", and was for the plaintiff upon a written guaranty. The appellate court reversed the judgment non obstante veredicto, holding that the trial court was powerless to enter it. An authority relied upon was the case of British General Ins. Co. v. Ripy, 1937, 130 Tex. 101, 106 S.W.2d 1047, by the Commission of Appeals and adopted by the

Supreme Court. Chief Justice Hickman, in the Williams v. Wyrick case, refers to said opinion and points out that it is not in harmony in all respects with the holding in Williams v. Wyrick. We believe that the latter case overrules the former in all respects of contradiction.

■ At first it might seem that a hiatus is created in view of the fact that both cases, Couch v. City of Richardson, and Turner v. Texas Sportservice, were disposed of by refusal of writs applied for with the notation "no reversible error". It is resolved, however, when it is remembered that rendition and entry of a judgment non obstante veredicto is an exercise of judicial discretion and not a ministerial act by the court. It is when the judgment entered is rendered on the jury verdict that the act of the court is ministerial. Propriety of the action taken by the Supreme Court upon both cases is thus made apparent.

By points of error Nos. 24 to 29, inclusive, the appellant complains that appellees' pleadings and evidence were deficient in setting forth the proper measure of damages. Article 4004, Vernon's Ann.Civ.St., sets forth the measure of damages applicable to be assessed when actionable fraud has been established by a plaintiff, as follows, viz.: "* * * All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented * * * and the actual value of the property in the condition it is delivered at the time of the contract. * * *"

The answers of the jury established the values requisite to determining the actual damages sustained by appellees under the provisions of Article 4004. The judgment entered was based upon damages as therefrom calculable. Appellant objected to the submission of the issues on the ground that there were no pleadings to support them and no evidence tending to show the market values at the times inquired about.

■ Without necessity of comment upon the matter of whether the objection was good as related to the pleadings upon which the case went to trial, we have arrived at the conclusion that the objection and exception was good as related to the evidence in the record, i. e., that the submission of the special issue upon the matter of the value of the property as it was delivered (not what the value would have been had it been as represented) was not supported by the evidence.

The only evidence which could have relation to the matter of the value of the property in question as it was received came from the appellees' witnesses, Art Anderson and Joe Graham. When tested it becomes clear that the time, as of which the true value of the property was given, was not in fact the time as of which it was delivered to the appellees by the appellant. Rather was the time about which the testimony related on or about the date of May 25, 1957, or afterward. Said date was during or after the time when the water rose as the result of flood and inundated the appellees' property. On or about January 14, 1957, the appellees contracted to buy and receive the property from the appellant and the latter did, on or about March 6, 1957, deliver the property to the appellees in final consummation of the transaction. This date was over two and one-half months prior to the time the flood occurred and damaged the appellees' property. This damage should not be confused with "damages" which appellees would be entitled to recover of and from the appellant upon proper proof of the latter's fraud in delivering the property to them in circumstances other than as represented. It is the latter form of "damages" which appellees seek to collect of and from the appellant because of actionable fraud under Article 4004.

Excerpts from Mr. Anderson's testimony include:

"Q. Now knowing that the houses in a flood area and has been flooded and subject to possible floods in the future, what is the fair and reasonable cash market value of the property?

"Mr. McDonald: At what time?

"Mr. Shropshire: As of May 25, 1957.

"A. I doubt whether the property could have been sold to any advantage at all after the flood unless at just kind of a give-away price or something like that. Might have been for an investment. Somebody might have taken a little chance on it. I would depreciate the property at least 40 or 50% in the flood area.

"Q. You would depreciate it 40 or 50%? A. That's right.

"Q. Would you say from that, that— A. Somebody, some investor may get in there and think, well, it won't flood again, I will buy the property and rent it or something like that, I don't know. I don't believe you could get another loan company to take over the loan.

"Q. All right. Apply your percentage here to the figure that you gave us awhile ago and tell us in dollars and cents the price that you would estimate to be the reasonable cash market value on March 25, 1957. I beg your pardon, May 25, 1957. A. I would say between $6,000.00 and $7,200.00."

Excerpts from Mr. Graham's testimony include:

"Q. All right, sir. Now you used the term a moment ago economic depreciation. Was that the term you used? A. Yes, sir.

"Q. Would you explain to us just what you mean by that term as it applied to this particular situation? A. Well there is three kinds of depreciation at least: one of them would be physical depreciation, deterioration of the property itself, another one would be the obsolescence, something that was good years ago that might cost money but would be worth nothing at all today, such as a 14 foot ceiling, which

would cost more to replace, and the other is what we term economic depreciation. For instance, if you had a piece of property and they built a railroad by the side of you, it wouldn't touch you, wouldn't bother you, but your property wouldn't be worth as much because of the noise and nuisance value of it, and the same thing is true of the flood. Because it is in a flood area people will not pay as much for that property as they would have paid for it if the flood had not occurred.

"Q. I take it that is the particular economic depreciation you are talking about. A. That is the depreciation that I was attempting to determine, what it suffered because the flood came.

"Q. Did you determine this on a percentage basis or just how did you go about it? A. It was more or less on a percentage basis. A group of appraisers who were going to work in the area met and discussed the problem and decided that possibly—

\* \* \* \* \* \*

"Q. Well, let me ask you specifically then, Mr. Graham, as to your appraisal of the Cranford home. Did you make an appraisal and can you give us your opinion as an appraiser of the reasonable fair cash market value of the Cranford home prior to the occurrence of the flood in May of 1957? A. I have a copy of the appraisal. The fair market value before the flood was $12,545.00 and the fair market value after the flood $7,500.00.

\* \* \* \* \* \*

"Q. All right, sir. And your appraisal of the fair market value after the flood in May of 1957 was $7,500.00. It that correct? A. That's right."

The proof relevant to the value of the property concerned should have been as of the time at which the value is to be determined in a fraud case, i. e., at time the property was delivered. 20-A Tex. Jur., p. 228, "Fraud and Deceit", sec. 123, "Damage—Value". Here the proof was as of a different time. In view of the nature of the property concerned and in view of the fact that only approximately two and one-half months' difference in time is involved, we have attempted to test the testimony to determine its sufficiency to raise the necessary issue. We have reached the conclusion that whatever might be said upon the weight to be given such evidence, were the issue raised, the evidence in and of itself is nevertheless insufficient to raise the issue. An influential factor in our reasoning is the fact that in all the testimony the difference in time was pointed up as being before the flood in 1957 and after the flood in 1957. As applied to the property in question, we believe this is most material, for certainly the value of property in a flood area which has not yet been inundated might be considered by a jury to have differed appreciably from the value of the same property which is not only subject to being flooded, but actually has been inundated in a flood which did damage to it.

In view thereof, we are of the opinion that the judgment of the trial court must be reversed. The judgment having been for the appellees, but either on evidence not fully developed or because of the trial of the damages phase on an erroneous theory, we are of the opinion that the ends of justice will be better served by a remand of the cause for another trial.

Reversed and remanded.